FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

2007 NOV -9  A 11: 27

CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| LAURENT BRISSON, DAVID CARLSON, JON ) | STATE CIVIL ACTION NO: |
| CARROLL, MATTHEW CARROLL, JESSICA ) | 05-736 |
| CARROLL, BRIANA CARROLL, HARLEY ) |  |
| CARROLL (by his next friend and father ) | CIVIL ACTION NO: |
| MATTHEW CARROLL), KURT FISHER, ) | 1:07 CV 1142 |
| RONALD L. KISER, MANAL MORSY, ) | CMH TRJ |
| DARRICK WILKINS, RICHARD T. STEVENS, ) |  |
| THOMAS P. McCARTHY, MOHAMMED ) |  |
| MOEIN, THOMAS PREDMORE, MARTIN H. ) |  |
| LANDAU, STEVEN MONAGHAN, ANN M. ) |  |
| SEGAL, STEPHEN J. SEGAL, DUKE PHAN, ) |  |
| ELVIA PHAN, ROSE REICHE, ANADAMOY ) |  |
| SAHOO, TED WALDMAN, JOSEPH R. ) |  |
| YENOVKIAN, and ZYKRONIX, INC. ) |  |

            Plaintiffs,

    v.

GRANT THORNTON, L.L.P.,

        Defendant.

**NOTICE OF REMOVAL**

COMES NOW Defendant Grant Thornton, L.L.P. ("Grant Thornton"), by and through its

undersigned counsel, and pursuant to 28 U.S.C. §§ 1331, 1441 and 1446 respectively show this

Court as follows:

1.

On October 22, 2007, Laurent Brisson, David Carlson, Jon Carroll, Matthew Carroll,

Jessica Carroll, Briana Carroll, Harley Carroll (by his next friend and father Matthew Carroll),

Kurt Fisher, Ronald L. Kiser, Manal Morsy, Darrick Wilkins, Richard T. Stevens, Thomas P.

McCarthy, Mohammed Moein, Thomas Predmore, Martin H. Landau, Steven Monaghan, Ann

M. Segal, Stephen J. Segal, Duke Phan, Elvia Phan, Rose Reiche, Anadamoy Sahoo, Ted

Waldman, Joseph R. Yenovkian, and Zykronix, Inc. (collectively "Plaintiffs") filed a Second

Amended Complaint (the "Complaint") against Grant Thornton in the Circuit Court for

Arlington County, Virginia, At Law N0. 05-736, asserting, *inter alia*, federal claims arising

under Section 18(a) of The Securities Exchange Act of 1934. A copy of the Complaint is

attached hereto as Exhibit "A."

2.

The Complaint was served on Grant Thornton on October 22, 2007. Accordingly, Grant

Thornton has thirty (30) days or until November 21, 2007, to file this Notice of Removal in this

Court pursuant to 28 U.S.C. § 1446(b). Grant Thornton files this Notice of Removal this 9th

day of November, 2007, which is before November 21, 2007, and within thirty (30) days of

Grant Thornton's receipt of Plaintiffs' Complaint. The Complaint was the first pleading, motion,

order or other paper from which Grant Thornton could ascertain that this case was removable.

3.

Upon information and belief, based upon a search of court records[1], Grant Thornton is the

only defendant who has been served with summons and the Complaint in this action as of the

date of filing of this Notice of Removal. Consequently, no other defendant needs to join in this

Notice of Removal pursuant to 28 U.S.C. § 1446(b).

4.

This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1441(b)

(federal question jurisdiction). In part, that section provides that "[a]ny civil action of which the

district courts have original jurisdiction founded on a claim or right arising under the *** laws of

---

[1]  According to a review of the state court docket, no proof of service of summons has been filed in this action with respect to any other defendants.

the United States shall be removable without regard to the citizenship or residence of the parties."

5.

This Court has federal question jurisdiction over this action because the Complaint is based on the law of the United States—The Securities Act of 1934. In particular, Count II of the Complaint alleges "violation of Section 18(a) of The Securities Exchange Act of 1934, 15 U.S.C. § 78r." (Cmplt. ¶¶ 57-63). Plaintiffs allege that Grant Thornton's statutory violations "inflicted serious financial harm" on them. (Cmplt. ¶ 63). On the face of the Complaint itself, Count II explicitly arises under the law of the United States, and, therefore, this Court has original jurisdiction over this Count pursuant to 28 U.S.C. § 1331.

6.

This action is therefore removable to this Court under 28 U.S.C. § 1441(a)(b) because it is a civil action founded on a claim or right arising under the "laws of the United States," over which this Court has original jurisdiction.

7.

Further, this Court has supplemental jurisdiction over Plaintiffs' other claims in Count I of the Complaint pursuant to 28 U.S.C. § 1367(a). Because Plaintiffs' claims in Count I arise out of the same alleged transactions, events, or occurrence as Plaintiffs' federal claims in Count II of the Complaint over which this Court has original jurisdiction, the factual claims in Count I are "so related to claims [in Count II] . . . that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

3

8.

Pursuant to 28 U.S.C. § 1441 (a), Grant Thornton attaches hereto as Exhibit "B," a copy of all of the process, pleadings, and orders previously served upon Grant Thornton in the Action.

9.

Pursuant to 28 U.S.C. § 1446(d), Grant Thornton will promptly notify all parties and the Circuit Court for Arlington County, Virginia, of this removal through a *Notice of Filing of a Notice of Removal,* a copy of which is attached as Exhibit "C."

10.

By filing this Notice of Removal, Grant Thornton does not waive, either expressly or impliedly, its respective rights to assert any defenses that the Grant Thornton could have asserted in the Circuit Court for Arlington County, Virginia.

WHEREFORE, Defendant Grant Thornton pray that the filing of this Notice of Removal and the aforementioned notices to the Circuit Court of Arlington County, Virginia, and to the Plaintiffs shall effect the removal of this action from the Circuit Court of Arlington County, Virginia, to the United States District Court for the Eastern District of Virginia, Alexandria Division.

Respectfully submitted,

Andrew Nicely (VSB No. 41750)
Brad P. Rosenberg (VSB No. 44495)
Jay C. Johnson (VSB No. 47009)
MAYER BROWN LLP
1909 K Street, NW
Washington, D.C. 20006
(202) 263-3000
(202) 263-3300 (fax)

Of Counsel
Andrew J. Morris
*Attorneys for Defendant Grant Thornton LLP*

4

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2007, copies of the foregoing *Notice of Removal* were served on the following via e-mail and U.S. Mail, postage prepaid:

> Elizabeth K. Tripodi, Esq.
> Donald J. Enright, Esq.
> Michael G. McLellan, Esq.
> Finkelstein Thompson LLP
> 1050 30th St., NW
> Washington, DC 20007
>
> Scott L. Adkins, Esq.
> Law Offices of Scott L. Adkins
> 1631 South Cypress Road
> Pompano Beach, FL  33060
> leather1@gmail.com
>
> Steven M. Reiness, Esq.
> Law Offices of Steven M. Reiness, PLLC
> 396 Broadway, Suite 601
> New York, NY 10013
> smr@artlegal.net
> steve.reiness@gmail.com

Brad P. Rosenberg / for

# EXHIBIT A

VIRGINIA:

## IN THE CIRCUIT COURT FOR ARLINGTON COUNTY

| | |
|---|---|
| LAURENT BRISSON, DAVID CARLSON, JON CARROLL, MATTHEW CARROLL, JESSICA CARROLL, BRIANA CARROLL, HARLEY CARROLL (by his next friend and father MATTHEW CARROLL), KURT FISHER, RONALD L. KISER, MANAL MORSY, DARRICK WILKINS, RICHARD T.STEVENS, THOMAS P. McCARTHY, MOHAMMED MOEIN, THOMAS PREDMORE, MARTIN H. LANDAU, STEVEN MONAGHAN, ANN M. SEGAL, STEPHEN J. SEGAL, DUKE PHAN, ELVIA PHAN, ROSE REICHE, ANADAMOY SAHOO, TED WALDMAN, JOSEPH R. YENOVKIAN, and ZYKRONIX, INC., | Chancery No. 05-736<br><br><br><br>JURY TRIAL DEMANDED<br><br>**RECEIVED**<br><br>OCT 2 2 2007<br><br>DAVID A. BELL, CLERK<br>Arlington County Circuit Court<br>by_____Deputy Clerk |
| Complainants, | |
| v. | |
| GRANT THORNTON, L.L.P. | |
| Respondent. | |

## SECOND AMENDED COMPLAINT

COME NOW THE COMPLAINANTS, by counsel, and file this Bill of

Complaint against Grant Thornton, L.L.P., (referred to as "Grant Thornton," "GT," or

"Respondent"), stating and alleging as follows:

### *Jurisdiction and Parties*

1.      Complainant Laurent Brisson, a resident of Chamblis, Quebec, Canada, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $15,000 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

2.      Complainant David Carlson, a resident of Fresno, California, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $27,900 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

3.      Complainant Jon Carroll, a resident of Murfreesboro, Tennessee, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $12,000 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

4.      Complainants Matthew Carroll, Jessica Carroll, Briana Carroll, and Harley Carroll, a minor, by his father Matthew Carroll, residents of Portland, Connecticut, were at times material hereto Xybernaut stockholders who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $10,000 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

5.      Complainant Kurt Fisher, a resident of Dallas, Texas, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $67,000 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

6.      Complainant Ronald L. Kiser, a resident of Odessa, Florida, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit opinions

for Xybernaut and suffered approximately $90,000 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

7.     Complainant Manal Morsy, a resident of Blue Bell, Pennsylvania, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $27,000 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

8.     Complainant Darrick Wilkins, a resident of Atlanta, Georgia, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $3,200 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

9.     Complainant Richard T. Stevens, a resident of Hudson, New Hampshire, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $53,000 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

10.     Complainant Thomas P. McCarthy, a resident of Kingstowne, Virginia, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $100,000 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

11.     Complainant Mohammed Moein, a resident of Houston, Texas, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $17,000 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

12.     Complainant Thomas Predmore, a resident of Annandale, Virginia, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $8,400 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

13.     Complainant Martin H. Landau, a resident of Salida, Colorado, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $2,000 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

14.     Complainant Steven Monaghan, a resident of New York, New York, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $60,000 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

15.     Complainants Ann M. Segal and Stephen J. Segal, residents of Glendale, California, were at times material hereto Xybernaut stockholders who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $14,500 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

16.     Complainants Duke Phan and Elvia Phan, residents of San Bernardino, California, were at times material hereto Xybernaut stockholders who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $285,000 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

17.     Complainant Rose Reiche, a resident of Carbondale, Pennsylvania, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit

opinions for Xybernaut and suffered approximately $27,000 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

18.     Complainant Anandamoy Sahoo, a resident of Roundlake, Illinois, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $48,000 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

19.     Complainant Ted Waldman, a resident of New York, New York, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $1,500 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

20.     Complainant Joseph R. Yenovkian, a resident of Los Angeles, California, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $51,500 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

21.     Complainant Zykronix, Inc., a corporation organized and existing under the laws of the state of Colorado, was at times material hereto a Xybernaut stockholder who relied on GT's unqualified audit opinions for Xybernaut and suffered approximately $300,000 in economic losses as a consequence of GT's negligent performance of its contract with Xybernaut.

22.     Respondent Grant Thornton holds itself out as, and upon information and belief is, a limited liability partnership organized under the laws of the State of Illinois. Grant Thornton, LLP is, according to its website, the U.S. member firm of Grant Thornton International.

23.     GT provides auditing and accounting services for publicly-traded companies, and conducts business and maintains an office in Arlington County, Virginia. This Court has personal jurisdiction over GT under *Va. Code* §8.01-328.1.A.1, and this Court has subject-matter jurisdiction as this is a court of general jurisdiction and the amount in controversy here easily meets this Court's jurisdictional threshold. Venue is proper in this county under *Va. Code* §8.01-262.

## Facts

24.     GT contracted to provide professional auditing and accounting services for a Virginia-based publicly-traded company, Xybernaut Corporation ("Xybernaut") from sometime in early 2000 until GT resigned as Xybernaut's auditors on or about April 14, 2005.

25.     Both GT and Xybernaut intended that Xybernaut's stockholders would benefit from this contract for professional auditing services. That intent is apparent from GT's and Xybernaut's public statements about GT's audit work for Xybernaut. First, GT's audit reports are addressed to Xybernaut's board of directors and to Xybernaut's "stockholders." Second, as a publicly-traded company, Xybernaut contracted for GT's audit work to benefit Xybernaut's stockholders, which is why Xybernaut later warned its stockholders in April 2005 that certain of its financials audited by GT could no longer be relied upon by Xybernaut's stockholders. Third, it is inconceivable that GT would take the position that stockholders of its publicly-traded clients are not intended beneficiaries of the audit services that GT provides, especially in this post-Enron, post-Sarbanes-Oxley environment where the Public Company Accounting Oversight Board now polices accounting firms' conduct.

26.     GT resigned as Xybernaut's auditors after Xybernaut's now-former Chief Financial Officer ("CFO") Bruce C. Hayden ("Hayden"), who was hired on October 25, 2004, raised concerns with Xybernaut's Audit Committee. Those concerns included the propriety and documentation of expenses by Xybernaut's Chairman and Chief Executive Officer ("CEO") Edward G. Newman; the propriety and documentation of expenses by Xybernaut's Chief Operating Officer ("COO") Steven Newman; the propriety of certain material transactions; the efficacy of Xybernaut's internal control environment; Xybernaut's public-disclosure process; and the accuracy of Xybernaut's publicly-reported financial results.

27.     Xybernaut's Audit Committee launched an investigation and, on February 28, 2005, hired the Atlanta law firm of Alston & Bird to assist in that investigation. The United States Securities & Exchange Commission ("SEC") and the United States Department of Justice ("DOJ") also launched investigations. Upon information and belief, Xybernaut and Alston & Bird produced documents and reports to the SEC, the DOJ, or both, that detailed the Audit Committee's findings as well as those of Alston & Bird.

28.     Xybernaut's Audit Committee finished its investigation on April 19, 2005, just five days after GT resigned as Xybernaut's auditor. Shortly after the Audit Committee finished its investigation, Xybernaut demanded that both Edward and Steven Newman resign. The Newmans tendered their resignations soon after. Both Newmans were indicted for criminal securities fraud and money laundering charges on October 19, 2007.

29.     According to filings that Xybernaut has made in its Chapter 11 bankruptcy

proceedings in the Eastern District of Virginia and with the SEC, Xybernaut's Audit Committee found that Edward G. Newman had improperly used substantial company funds for personal expenses; that Xybernaut did not adhere to its internal controls; and that Xybernaut's board of directors had been wrongly informed about material financial conditions regarding major transactions.

30. These findings led Xybernaut to warn investors and shareholders, like the complainants here, that Xybernaut's previously-reported financial results for fiscal years ended December 31, 2002 and December 31, 2003 could no longer be relied upon. Xybernaut also told its shareholders that the results for those periods would have to re-audited by a new auditing firm. Xybernaut recently sought bankruptcy court approval to hire a new audit firm, Goodman & Co.

31. Grant Thornton audited Xybernaut's financial results for fiscal years 2002 and 2003. To that end, Grant Thornton provided shareholders the following certification in Xybernaut's SEC Form 10-K, for fiscal year 2003, which Xybernaut filed with the SEC on or about March 12, 2004:

## REPORT OF INDEPENDENT ACCOUNTANTS

To the Board of Directors and

Stockholders of Xybernaut Corporation

We have audited the accompanying consolidated balance sheets of Xybernaut Corporation (a Delaware corporation) as of December 31, 2003 and 2002, and the related consolidated statements of operations, stockholders' equity, and cash flows for the three years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material

misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Xybernaut Corporation as of December 31, 2003 and 2002, and the results of its operations and its cash flows for the three years then ended in conformity with accounting principles generally accepted in the United States of America.

/s/ Grant Thornton LLP

Vienna, VA
February 19, 2004

32.     For fiscal years 2001 and 2002, Xybernaut provided shareholders, like

complainants here, similar assurances when, in Xybernaut's SEC Form 10-K for fiscal

year ended December 31, 2002, Grant Thornton said:

## REPORT OF INDEPENDENT ACCOUNTANTS

To the Board of Directors and

Stockholders of Xybernaut Corporation

We have audited the accompanying consolidated balance sheets of Xybernaut Corporation (a Delaware corporation) as of December 31, 2002 and 2001, and the related consolidated statements of operations, stockholders' equity, and cash flows for the three years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Xybernaut Corporation as of December 31, 2002 and

2001, and the results of its operations and its cash flows for the three years then ended in conformity with accounting principles generally accepted in the United States of America.

/s/ Grant Thornton LLP

Vienna, VA

February 13, 2003
(except for Notes 3 and 14 as to which the date is March 26, 2003)

33.    When conducting the audits referred to above and when issuing the audit

opinions quoted above, Grant Thornton acted negligently, and thus did not act in

accordance with Generally Accepted Audit Standards ("GAAS"). Grant Thornton acted

negligently because Grant Thornton's auditors failed to detect that: (i) Xybernaut's

financial statements were not prepared in conformity with Generally Accepted

Accounting Procedures ("GAAP"); (ii) Xybernaut's financial statements for years 2001,

2002, and 2003 did not present fairly, in all material respects, Xybernaut's financial

position for fiscal years ended 2001, 2002, and 2003; and (iii) Grant Thornton's auditors

overlooked, among other things, the following:

> · improper reporting of revenue for certain product sales;
> · improper reporting of related-party transactions; and
> · improper accounting for reimbursement of expenses.

34.    Unfortunately, GT overlooked certain "red flags" that should have led GT

to question Xybernaut's representations and to seek more evidentiary support. Obtaining

sufficient evidentiary support through inspection, observation, audit tests, inquiries, and

confirmations so that that an auditor's opinion and audit rests on a reasonable basis is part

of the duty of care that auditors must follow under GAAS, according to Statements of

Auditing Standards §326.01. Little doubt exists that GT was, in fact, negligent. Hayden

discovered the "red flags" after being with the Company for just a few months: the Audit

Committee uncovered the truth shortly thereafter; GT, on the other hand, overlooked these "red flags" for years.

35.     Statements of Auditing Standards § 230.01 require auditors like GT to exercise due professional care. That due professional care concerns what the auditor does and how well the auditor performs the audit. See generally Statements of Auditing Standards § 230.04. GT, however, did exercise due professional care. This is so because: (i) GT did not gather enough competent evidence to support GT's audit report that Xybernaut's financials complied with GAAP; (ii) GT did maintain a professional attitude of skepticism in its role as an auditor; and (iii) GT failed to provide an accurate audit report for Xybernaut's shareholders, to whom the reports were addressed.

36.     In overlooking the "red flags," GT breached its duty of professional care when it certified Xybernaut's financial results for 2001, 2002, and 2003. The "red flags" that GT overlooked included the following:

          (a) Edward G. Newman's and Steven Newman's failures to properly
              substantiate and document personal expenses charged to Xybernaut.
          (b) Xybernaut's lack of adherence to internal and disclosure controls
              governing the Company's publicly-disclosed financial results.
          (c) Major transactions entered into that violated Xybernaut's own internal
              controls and GAAP rules for revenue recognition.

37.     The existence of these "red flags," which Hayden and the Audit Committee quickly uncovered in early 2005, should have put GT on notice regarding the Newmans', i.e., senior management's, lack of integrity; it should have caused GT to re-assess its own risk assessments. But the existence of these "red flags," did not affect GT's audits. GT negligently issued unqualified audit opinions, saying that Xybernaut's financials reports were prepared in accordance with GAAP when, clearly, they were not.

Here, GT violated Statements of Auditing Standards § 508.07, which says that an auditor can only give an unqualified audit opinion if the auditor has conducted the audit in accordance with GAAS. But, as alleged herein, GT's audits did not comport with GAAS; instead, they violated GAAS.

38.     For example, GT overlooked the fact that Xybernaut failed to adequately disclose its accounting policies for recognizing revenue. That information was "essential" for users of Xybernaut's financial statements – users like Xybernaut's shareholders who are complainants here. See APB Opinion No. 22. para. 7.

39.     Concerning GT's unqualified opinion for Xybernaut's 2001 and 2002 financials, GT violated Statement on Auditing Standards ("SAS") 82, which as of October 15, 2002 was superseded by SAS No. 99. SAS No. 82 required GT to consider the risks that Xybernaut's audited financial statements might not be free of material misstatement cased by error or outright fraud. GT violated this standard because GT negligently overlooked or disregarded the red flags mentioned above. Nor did GT test for the conditions, i.e., the "red flags," that led to Xybernaut's announcement that investors and Xybernaut shareholders could no longer rely on Xybernaut's previous financial statements for which GT issued clean audit reports.

40.     SAS No. 99, which superseded SAS No. 82, supra, became effective for audits of financial statements for periods beginning on December 15, 2002, i.e., for GT's audit of Xybernaut's fiscal year 2003, for which GT gave Xybernaut the unqualified audit report on February 19, 2004, reproduced supra. SAS No. 99 was established as the cornerstone of a multi-faceted effort by the American Institute of Certified Public Accountants to restore investor confidence and re-establish audited financial statements

as a clear picture window into Corporate America.

41.     SAS No. 99 required GT to "put[] aside any prior beliefs about
management's honesty" . . . and to "think about and explore the question, 'If someone
wanted to perpetrate a fraud, how would it be done?'" SAS No. 99 requires GT to do so
that GT's audit team could "design audit tests responsive to the risks for fraud." GT
negligently failed here under SAS No. 99. Upon information and belief, GT neither
asked about nor designed audit tests to detect: (i) the Newmans' improper charging of
personal expenses to Xybernaut; (ii) a breakdown in Xybernaut's internal and disclosure
controls; and (iii) Xybernaut's recognizing revenue in violation of GAAP.

42.     SAS No. 99 also required GT to test whether management was overriding
Xybernaut's internal controls. Management, *i.e.*, the Newmans, routinely and improperly
overrode Xybernaut's internal controls, but GT did nothing to test for such overrides, and
in so doing, violated the professional standard of care due Xybernaut's stockholders.

43.     GT also violated SAS Nos. 1 and 53 by failing to adequately plan and
supervise its audits of Xybernaut, as explained in paragraphs 27 through 30, *supra*.

44.     GT violated GAAS Standard of Field Work No. 2, which required GT's
audit team for Xybernaut to make a proper study of Xybernaut's internal controls to
determine whether reliance on those internal controls was justified and whether such
controls were reliable. As Xybernaut's Audit Committee found, Xybernaut's internal
controls were in fact not reliable; GT should have so found years earlier, but it did not.
Had GT followed the professional standard of care, GT would have (and should have)
expanded the scope of audit procedures applied to Xybernaut's internal controls.

45.     Because GT violated GAAS Standard of Field Work No. 2, as alleged in

paragraph 32, *supra*, GT lacked a sufficient understanding of Xybernaut's internal controls, i.e., Xybernaut's control environment, accounting system, and control procedures, to both test those controls and then to opine on the adequacy of Xybernaut's financial reports.

46.     Each complainant read and relied on Xybernaut's annual financial reports and the unqualified audit opinions that GT provided for Xybernaut's fiscal years 2001, 2002, and 2003. Each complainant relied on GT's audit opinions in deciding whether to hold or sell their Xybernaut stock or whether to buy more Xybernaut stock. Each complainant also relied on those audit opinions in deciding not to take action either derivatively or directly against the Newmans, Xybernaut, and GT. And no complainant knew or had reason to know of the fraud at Xybernaut or GT's negligence in failing to uncover the fraud until Xybernaut's public announcements beginning in March 2005.

47.     Each Plaintiff herein was a shareholder of record at Xybernaut during the period of time relevant to this Complaint and its allegations.

48.     Contrary to what GT purported to assert in its recent demurrer to the First Amended Complaint, each Plaintiff here, as a shareholder of record, was known to GT. This is so because during its purported audits, GT reviewed stock transfer records, and for that reason, each Plaintiff was, in fact, specifically known to GT.

49.     GT knew, or should have known, that Complainants here—named in Xybernaut's stock transfer records—would rely on audit opinion letters that GT would issue, especially since GT would address those letters to Xybernaut's shareholders.

50.     The Complainants actually read, reviewed, and relied upon GT's audit opinion letters in GT's filings with the United States Securities & Exchange Commission.

Complainants' reliance can be characterized as "eyeball reliance."

51.    Those audit opinion letter were inaccurate, as alleged herein.

52.    GT caused those audit opinion letters, attached to Xybernaut's SEC Form 10-K to be filed with the SEC.

53.    Each complainant, a Xybernaut stockholder, suffered financial loss as a direct consequence of GT's negligence for the reasons explained in paragraph 34, *supra*. These losses were first precipitated when, on March 13, 2005, Xybernaut announced that it could not file its SEC Form 10-K for 2004 on time. In response, the price of Xybernaut stock dropped from $0.72 to $0.60 per share. Then, on March 31, 2005, Xybernaut announced that it had discovered material weaknesses in Xybernaut's internal controls for expense reimbursement, revenue recognition, and the monitoring of business risks. In response to this news, Xybernaut's stock dropped another $0.18 per share, from $0.42 to $0.24 per share.

*Count I - Breach of Contract*
*(Negligent Performance § 552 Restatement (Second) Torts)*

49.    Complainants incorporate by reference here paragraphs 1 through 53 as if fully restated herein.

50.    Xybernaut and GT contracted for GT to perform professional audit services on Xybernaut's financial statements.

51.     Xybernaut and GT intended that Xybernaut's stockholders benefit from the contract for professional auditing services. This is apparent at least from how GT addressed its audit opinions: "To Xybernaut Stockholders." This, along with GT's office as a "public accountant" indicates that GT and Xybernaut clearly and definitely intended to confer upon Xybernaut's shareholders a direct benefit from the contract for audit services that GT and Xybernaut executed.

52.     Complainants here qualify as intended third-party beneficiaries of the contract between Xybernaut and GT, and GT had actual knowledge of the Complainants identified in this Complaint for the reasons alleged in paragraphs 48 and 49, supra.

53.     GT bore a duty to Xybernaut shareholders to conduct its audits of Xybernaut and to issue audit opinions with the applicable professional standard of care. As alleged herein, GT repeatedly and negligently (not intentionally) violated that professional standard of care and thus breached its duty to Xybernaut stockholders like the Complainants here.

54.     Complainants expressly disclaim any notion that GT acted intentionally or consciously. Complainants also expressly disclaim any allegation that GT defrauded them or committed fraud.

55.     As alleged herein, Complainants reasonably and justifiably relied on GT's unqualified audit opinions.

56.     As alleged herein, Complainants' reasonable and justifiable reliance on

GT's unqualified audit opinions caused Complainants great economic loss.

*Count II—Violation of Section 18(a) of The Securities Exchange Act of 1934*

57.     Complainants repeat and reallege each of the allegations set forth above as if fully set forth herein.

58.     This claim is brought by all Complainants under Section 18 of The Securities Exchange Act of 1934, 15 U.S.C. § 78r.

59.     As set forth above, GT made or caused to be made statements which, at the time and in the light of the circumstances under which the statements were made, materially false or misleading, in documents filed with the SEC by Xybernaut, including Xybernaut's SEC Form 10-K filings.

60.     In connection with the purchase and holding of Xybernaut common stock, Complainants specifically read and relied upon Xybernaut's SEC Form 10-K and GT's audit opinion letters contained therein. Complainants relied on GT's audit opinion letters as being materially correct, accurate, and complete. Complainants' decisions to purchase and to hold Xybernaut common stock were based, in significant part, on Complainants' analysis and reliance on GT's audit opinion letters.

61.     Complainants reasonably relied upon GT's audit opinion letters, not knowing that, in fact, those letter were inaccurate and that GT had failed to adhere to relevant auditing standards necessary to provide an accurate, complete, and correct audit opinion.

62.     Had Complainants known that GT's audit opinion letters were inaccurate, they would not have purchased Xybernaut common stock, nor would they have held Xybernaut common stock.

63.   When the truth began to emerge about Xybernaut's true financial condition and about how Xybernaut's principals were looting the company for personal gain, and when GT resigned as auditor, Xybernaut's stock price collapsed, which inflicted serious financial harm on Complainants.

WHEREFORE, COMPLAINANTS demand a trial by jury, their economic losses plus pre-judgment interest, their costs and attorneys' fees, and such other relief as this Court deems just and proper.

Dated: October 22, 2007            COMPLAINANTS

                                   By Counsel

                                   _Elizabeth K. Tripodi_

                                   Elizabeth K. Tripodi (VA Bar No. 73483)
                                   Finkelstein Thompson, LLP
                                   The Duvall Foundry
                                   1050 30th Street, N.W.
                                   Washington, D.C. 20007
                                   (202) 337-8000
                                   (202) 337-8090 (facsimile)


OF COUNSEL:

Donald J. Enright
Michael G. McLellan
Finkelstein Thompson, LLP
The Duvall Foundry
1050 30th Street, N.W.
Washington, D.C. 20007
(202) 337-8000
(202) 337-8090 (facsimile)

Scott L. Adkins, Esquire
LAW OFFICES OF SCOTT L. ADKINS
1631 South Cypress Road
Pompano Beach, Fl 33060
Tel. (954) 319-6739

Page 18 of 19

Steven M. Reiness
LAW OFFICE OF STEVEN M. REINESS, PLLC
396 Broadway
Suite 601
New York, NY 10013
(member of the bar of the State of New York)